## A. P. Green Refractories Co., et al. *v.* Luckey, et al.

Argued December 7, 1972, before Judges CRUMLISH, JR., WILKINSON, JR., and MENCER, sitting as a panel of three. Reargument denied, April 5, 1973. Per Curiam.

*John F. McElvenny,* for appellants.

*Seymour Kanter,* with him *Halbert, Kanter & Bernstein,* for appellee.

OPINION BY JUDGE MENCER, March 22, 1973:

When Willie Luckey, Jr., (claimant) began working for A. P. Green Refractories Co., he first unloaded boxcars and then operated a brick crusher, both jobs being heavy, laborious, and unskilled work. Approximately three years after starting work for the company, on

January 12, 1967, claimant disassembled the crusher, cleaned it, and began to reassemble it—an operation required of and done by him from one to three times a week. While lifting from the ground a metal steel cover, which weighed approximately 100 pounds, he felt an immediate pain in his back on the right side. He could not straighten up and called his foreman for assistance.

Claimant later consulted his physician, Dr. Melnicoff, a general practitioner, on approximately twelve occasions over a six-week period of time. He was referred to Dr. Henry Sigmond, an orthopedic surgeon, on February 24, 1967, who ordered x-rays of the dorsal spine, low back, and right femur (the pain had extended into claimant's right leg). On March 8, 1967, claimant was admitted to Albert Einstein Medical Center in Philadelphia where he was seen in consultation by Dr. Pedro P. Polakoff, II, a neurosurgeon. On March 14, 1967, Dr. Polakoff performed a hemilaminectomy at L-4, 5 and L-5 S-1 on the right.[1] He was discharged from the hospital on March 23, 1967. Dr. Polakoff later testified that claimant could return to light work

---

[1] Dr. Polakoff described the operation as follows: "The operation performed is known as a hemilaminectomy. That is taking off a small portion of the bone over the area where the nerve and disc are located, foraminotomy which is opening up the foramen where the nerve goes out to relieve any bony impression on the nerve and this is also in the lateral portion of the spine, and then removing the disc. This was performed on the 14th of March 1967 under general anesthesia at which time there was a degeneration and small herniation at the L-4 level and at the L-5 level there was an extruded piece of disc material—that is a piece of disc had actually ruptured out of the interspace and was jammed down on the foramen between the nerve and the bone causing this gentleman's pain. This was removed after which the disc space itself was then entered and more degenerated disc removed. So that this man had two discs, one degenerated and one actually herniated and extruded at the lower level at L-5."

provided that he did not lift more than 25 pounds. He also testified that the incident at work on January 12, 1967, caused claimant's disc problem.[2]

On cross-examination, Dr. Polakoff related that there was evidence of disc degeneration at L-4 and L-5 noted at the time of the operation. X-ray examinations showed narrowing of the disc space between L-4 and L-5.

Dr. Martin Blaker, an orthopedic surgeon, examined claimant on September 11, 1968, and found "acute lumbosacral strain, status-post lumbar laminectomy and disc excision, findings strongly suggestive of conditions present prior to January 10, 1967 with atrophy of right lower extremity, mild, and shortening." Dr. Blaker related that, "In my opinion the procedure which was done here, laminectomy with disc excision was directed to a condition based upon prior vulnerability or prior changes in the spine present before January 10, 1967. . . . In my opinion the lifting which he is doing since it was a normal activity for him in his work frequently repeated for a long period of time, would not have produced a protrusion if the disc had been normal. If a protrusion then resulted from this normal activity, it must have been based upon prior weakness."[3]

---

[2] "My opinion is that the findings at surgery showed this gentleman could not possibly have been able to do any kind of work prior to the accident because of the findings of the extruded disc which had the nerve impinged against the bone. It could not have allowed him to tolerate the pain for any length of time and this therefore was commensurate with the history of the onset of pain from the injury at work and his inability to work thereafter because of the increasing pain until the time of its removal at surgery."

[3] Dr. Blaker further testified: "The findings on examination certainly suggested a prior change in the right lower extremity. Also the limited motion of the hips of both sides were suggestive of a prior condition. The history also suggested that he had had prior backaches for which he had been treated."

The referee entered findings of fact and conclusions of law to the effect that claimant sustained an accidental injury on or about January 12, 1967, and was totally disabled from January 13, 1967, to but not including July 7, 1967, when his total disability status changed to an undetermined partial disability which still persists. The referee awarded compensation for total disability and a continuing undetermined partial disability at the rate of $42.00 per week.

Claimant, born in 1920, has had back problems before. In 1947, after attempting to lift a heavy object, he had low back pain and consulted a doctor for a few months. He wore a back brace for one or two months but continued his usual activities. Evidently between 1947 and 1967 he held jobs as a farmer, general laborer, plumber's helper, and forklift operator. During that twenty-year period he had back pains off and on. In approximately 1963 he again had low back pain, but, after x-rays but no medical treatment, he returned to his usual activities within a few days. In January 1967 (before the lifting incident later that month) he jumped off a forklift and developed a slight ache in his low back.

The referee's second finding of fact is therefore particularly significant: "The nature and cause of the injury were *an aggravation of a pre-existing weak low back,* when claimant, while reassembling a machine after cleaning same, and when in the act of replacing the heavy metal cover, while bending down and lifting the said metal cover he did violence to the bony structure of his low back so that he suffered the herniation of the intervertebral discs at the levels L4-L5 and L5-S1 on the right." (Emphasis added.)

A timely appeal was filed with the Workmen's Compensation (Appeal) Board which, without specifically discussing the referee's second finding of fact, affirmed

the findings of fact, conclusions of law, and award of the referee. Its opinion, in pertinent part, reads as follows:

"After a careful and independent review of the record, we are convinced that the Claimant met with an accidental injury and that he is entitled to the award. While the evidence here suggests that the Claimant had pains in his low back during his early youth, it is also true that he was in reasonably good health, immediately prior to the lifting incident described here. In our opinion, he was a healthy workman in view of the hard, laborious work which he steadily performed for the Defendant.

"On that basis, we conclude that an unexpected and unusual pathological result occurred to the Claimant's back while performing his regularly assigned duties. The accident here lies in the extraordinary nature of the effect, rather than in the cause of the disc protrusion, which the Claimant suffered. Claimant's disability was immediate, sudden and obvious and is supported by the medical opinion of his physician. Under the reasoning reported in Wance vs. Gettig Eng. & Mfg. Co., Inc., 204 Super. 297 (1964), the Claimant is entitled to the award."

We are now called upon to review that decision. Our review is limited to whether constitutional rights were violated, an error of law was committed, or any necessary finding of fact was not supported by substantial evidence. *Nash v. Sandnes' Sons, Inc.,* 6 Pa. Commonwealth Ct. 403, 295 A. 2d 615 (1972).

The essential issue in this case is whether or not a compensable "accident" occurred. "Disability overtaking an employe at work is not compensable unless it is the result of an accident. . . . While the Workmen's Compensation Act should be liberally construed, its purpose is to compensate for accidental injuries and

not to insure the life and health of an employe." *Rettew v. Graybill,* 193 Pa. Superior Ct. 564, 567-68, 165 A. 2d 424, 425-26 (1960). The burden of proving that an accident has occurred, moreover, is on the claimant. *Hurlburt v. Fidelity Window Cleaning Co.,* 192 Pa. Superior Ct. 152, 160 A. 2d 251 (1960). An accident is any unforeseen, untoward happening which was not to be reasonably anticipated. *Litman v. Litman,* 185 Pa. Superior Ct. 69, 137 A. 2d 918 (1958); *Lacey v. Washburn & Williams Co.,* 309 Pa. 574, 164 A. 724 (1933).

In *Hinkle v. H. J. Heinz Co.,* 7 Pa. Commonwealth Ct. 216, 222, 298 A. 2d 632, 635 (1972), we found that the cases disclose at least four basic categories of accidents: (1) a sudden, unexpected traumatic event such as a fall or blow; (2) unusual exertion in the course of work causing an unexpected and sudden injury; (3) an unusual pathological result of an ordinary condition of work; and (4) sudden and unexpected injury caused by the failure of an employer to furnish medical care to an employee.[4]

As we recently stated in *Collins v. U. S. Steel Corp.,* 7 Pa. Commonwealth Ct. 333, 336-37, 298 A. 2d 637, 638-39 (1972):

"In this case, because it was acknowledged that the claimant, when injured, was performing his usual work in the usual manner, only the first and third classifications mentioned above could be applicable. It is our opinion, however, that the claimant has failed to carry the burden to show that his injury was caused by an 'accident,' as defined by either of these remaining classifications.

---

[4] An additional category might include falls from a pre-existing disease as in *Miller v. Schiffner & Sons,* 196 Pa. Superior Ct. 84, 173 A. 2d 707 (1961), and in *Allen v. Patterson-Emerson-Comstock, Inc.,* 180 Pa. Superior Ct. 286, 119 A. 2d 832 (1956).

"To prove an accident under the first classification requires a showing of more than a feeling of pain. There must be a specific occurrence causally related to the onset of the pain. '[P]roof merely of the sudden onset of pain while an employe is engaged in his usual work in the usual manner is no evidence of an accident even where there is no evidence of a pre-existing condition; the basis of the holding is that the occurrence of the pain may not have been coincidental with the development of the injury which caused the pain and does not alone, therefore, furnish proof that an injury by accident *occurred* at the time the pain was felt." (Citing cases.) It is clear, therefore, that an "accident," as defined above, did not occur in this case.

As we recognized in *Collins,* more recent decisions have developed the Unusual Pathological Result Doctrine as a liberal consequence of the strict construction accorded the definition of "accident." The attempted distinction between "those [accidents] that are compensable and those that are not compensable [, which] are divided by a line which at times appears indistinct," *York v. State Workmen's Ins. Fund,* 131 Pa. Superior Ct. 496, 498, 200 A. 230, 231 (1938), has indeed "plunge[d] this branch of the law into a Serbonian bog."[5]

Essentially the third category mentioned above, the doctrine holds that where an employee sustains an injury to some part of his body *not previously injured or diseased,* resulting in a break of the bony structure or a tear in the soft tissue of the body, while doing his

---

[5] *See Landress v. Phoenix Mut. Life Ins. Co.,* 291 U.S. 491, 499 (1934) (CARDOZO, J.) ; Comment, *Pennsylvania Workmen's Compensation: An Analysis of Persistent Problems and Recent Legislative Reform,* 76 Dick. L. Rev. 445, 453-59 (1972) ; Barbieri & Quinn, *The Unusual Pathological Result Doctrine in Pennsylvania,* 39 Temple L. Q. 51 (1965).

usual duties in the usual way, then the injury is compensable because the accident resides in the extraordinary nature of the effect rather than in the cause. *Corbeil v. A. & P. Stores,* 213 Pa. Superior Ct. 1, 245 A. 2d 864 (1968). But if the claimant has a pre-existing physical weakness but suddenly the stress of his normal duties accelerates the pathology to a painful and disabling consequence, there can be no recovery, and the doctrine has no application. *Rettew v. Graybill, supra; Gammaitoni v. Gasparini Excavation Co.,* 185 Pa. Superior Ct. 643, 139 A. 2d 675 (1958) ; *Landis v. General Motors Corp.,* 180 Pa. Superior Ct. 332, 119 A. 2d 645 (1956). Thus, when the performance of one's usual employment duties aggravates a pre-existing chronic back ailment, there can be no recovery under the doctrine. *See, e.g., Rupchak v. Westinghouse Electric & Mfg. Co.,* 161 Pa. Superior Ct. 228, 54 A. 2d 309 (1947). But the employee need not be a perfect physical specimen because a pre-existing condition does not bar a finding of an accident *if the condition was not causally related to the injury claimed. Gasparovich v. Federal Reserve Bank of Cleveland,* 194 Pa. Superior Ct. 137, 166 A. 2d 57 (1961).

We are faced here with a seemingly contradictory holding by the Board. On the one hand it finds that claimant had back problems "during his early youth" but was healthy enough on January 12, 1967, to qualify for an award under the Unusual Pathological Result Doctrine. On the other hand it affirms without comment the referee's finding that the claimant's injury resulted from "an aggravation of a pre-existing weak low back."

The Board was in error in saying that claimant had back problems only in his early youth, and that Dr. Blaker testified that "no causal relationship existed between the lifting incident and the subsequent protru-

sion of the discs in the Claimant's back." He in fact testified that, "Lifting in the presence of disease may initiate a protrusion."

Even with Dr. Polakoff's testimony that "[i]t is possible that the degenerated disc and minimal herniation at L-4 might have been in existence [prior to the lifting incident] and he could have worked with it but under no circumstances could that gentleman have possibly worked [prior to the lifting incident] or done any activity with the findings at L-5 . . . an extruded disc which had impinged the nerve against the bone and the foramen . . .", it is clear that there was a pre-existing condition causally related to the injury claimed. Consistent with both doctors' testimony is the referee's finding of fact that the claimant's injury resulted from "an aggravation of a pre-existing weak low back." Consequently, no reliance in this case can be placed on the Unusual Pathological Result Doctrine to establish a compensable accident within the meaning of the Workmen's Compensation Act.

Accordingly, we find it necessary to reverse the Board's decision and to deny claimant's request for compensation.

#### ORDER

AND NOW, this 22nd day of March, 1973, the order of the Workmen's Compensation (Appeal) Board is hereby reversed.